### The probate of the paper propounded as the Will of DAVID McGUIRE.

D. M. devised and bequeathed the residuum of his estate, by his will, to his "beloved wife I. P. M." It appeared that I. P. M. was not his wife, his former wife being alive. The will admitted to probate, nevertheless, the Surrogate holding that no undue influence appeared, and that the testator would not probably have made any different disposition had he known his former wife was alive.

A. O. HALL and H. D. TOWNSEND *for Proponent.*
WINTER, HARRIS & WOOD, *for Contestants.*

Isabella Phillips McGuire propounded for probate, May 25th, 1867, a paper purporting to be the last will and testament, bequeathing personal property only, of the decedent.. Her petition set forth that she was his widow, and that his only surviving heirs and next of kin were his three sons William James, George and Hugh, whose places of residence, after diligent search and inquiry, she had not been able to ascertain.

The citation was therefore published in the State paper for six weeks.

Upon the return day of the citation William James McGuire and Hugh McGuire, appeared and gave notice of contest, George McGuire being deceased. Harriet Jane McGuire, mother of these sons of the decedent, and claiming to be herself the widow of the decedent, also appeared and intervened as a contestant.

THE PROBATE OF THE WILL OF DAVID MCGUIRE.

Testimony was thereupon taken before the Surrogate. The following is the paper propounded as the will:

In the name of God: Amen. I, David McGuire, of the city, county and State of New York, being of sound mind and memory, and considering the uncertainty of this life, do therefore make, ordain, publish and declare this to be my last will and testament: That is to say: 1st. After all my lawful debts are paid and discharged, I give and bequeath and devise to my friend, Peter Smith, of the city of Chicago, State of Illinois, the sum of $6,000, to be held by him as special guardian for the following purposes: 1st. To pay certain indebtedness existing against me for a number of years, and which will now amount to about $1,000, provided he, the said Smith, can ascertain and find the parties entitled to receive the same; the balance of said $6,000 to be paid to such of my children as may be alive at the time of my death, share and share alike, to have and to hold the same, to them and each of them, absolutely and forever; it being, however, my will that said distribution shall not he made for two years after my death.

2d. I give, devise and bequeath to my beloved wife, Isabella Phillips McGuire, all the rest, residue and remainder of all my property, real, personal or mixed, of which I shall die seized and possessed, or to which I shall be entitled at the time of my decease, to have and to hold the same to her sole use and behoof forever.

3d. In the event that the special guardian or trustee above appointed shall not, after the most diligent inquiry and search, be able to ascertain the parties referred to, then, after a lapse of three years, I will and direct that the amount so held be transferred to my said wife.

Likewise, I make, constitute and appoint my said wife, Isabella Phillips McGuire, to be the executrix of this my last will and testament, hereby revoking all former wills by me made.

In witness whereof, I have hereunto subscribed my

name and affixed my seal, the 20th day of April, in the year of our Lord one thousand eight hundred and sixty-seven.

(Witnesses.)                    D. McGUIRE.

Subscribed by David McGuire, the testator named in the foregoing will, in the presence of each of us, and at the time of making such subscription, the above instrument was declared by the said testator to be his last will and testament, and each of us, at the request of said testator, and in the presence of each other, signs his name as a witness thereto, at the end of the will.

J. M. TIGHE,

Attorney at Law, 290 Broadway, residing at 381 Pacific street, Brooklyn, N. Y.

STEPHEN PHILLIPS,

Residing at 314 West 31st st., N. Y.

THE SURROGATE. The formalities required by statute upon the execution of wills appear, from the evidence, to have been complied with, in the case at bar. The decedent subscribed the instrument in the presence of the subscribing witnesses, declared it to be his will, requested the witnesses to sign it as such, received it back into his own hands, and gave it to the proponent, saying "here is the will for you."

At the time decedent was fifty-two years of age and was sick from consumption, of which he died twelve days after, on the 2d of May 1867. He had been married (calling himself a widower), to the proponent, Isabella Phillips, by the Rev. Dr. Morgan, at No. 123 Waverly place, in this city, on the 21st of January, 1863. He had been married, by the name of Daniel McGuire, to the contestant, Harriet Jane Cummings, in Davidson county Tennessee, on the 14th of June 1838. After his first marriage, he and the contestant, his wife Harriet Jane, lived in various places; at Nashville, Covington, Cincinnati, &c., and made a visit to Ireland, of which country

he was a native. About ten or twelve years ago, his wife being then in Tennessee, he disappeared altogether from her knowledge. He had been charged with committing some offense in Tennessee. He had said to his wife (they being then in Cincinnati), "you go to Tennessee and get William (her son), and we will all go clear out of the country, to Texas." She accordingly went, and while there in Tennessee, she received a New York newspaper containing a notice of his death. At first, she says, she believed it, but on reflection, remembering his fear of arrest, she began to discredit it, and believe that he was still alive. But she never heard of or from him again during his life. I consider that there is no question of the identity of this man. His wife recognized the photograph of him produced by the proponent, on the trial, in Court. He had very probably changed his name from Daniel to David, to aid in his purpose of deception.

It appears that there is or was a third female claiming a matrimonial connection with the deceased. His partner, the witness, Peter Smith, testifies that when he first knew the decedent, the latter was living in Third avenue with a lady whom he introduced to Smith as his wife, and whose maiden name was Eliza Moore. This connection was maintained up to 1863, at least. This third person, however, makes no appearance in these proceedings, and whatever claims she may have had may be considered as withdrawn or disposed of.

We find the decedent living with the proponent as man and wife in the summer of 1866, when the former declared to the witness Weed, his intention that "Belle" should have the greater part of his property; he added that he had two sons, as he supposed; that he had written letters to them, but had got no information of them; and that he intended to go, with his wife (the proponent), and see if he could find them; subsequently, the decedent was taken sick with his last illness, and, about three weeks before he died, Weed went out to find for him a person who

could draw his will; he returned with a Mr. Williams, who wrote a will, and it was executed; before making it, the decedent told Weed his purpose to give the proponent all his property, except that he should give his sons $3,000 apiece.

The proponent herself, in her testimony, states the contents of this first will; she says there was "something in it, giving to her the legacies of his sons, provided the latter should not be discovered within a certain period." The witness Tighe, who drew the later instrument (the one now offered and on trial before me), also states his recollection of the contents of this earlier will; he says that "there was no time stipulated in it, at which the $6,000 left to the children was to be paid."

Mr. Peter Smith now comes upon the scene. He was a partner of the decedent; learning of the illness of the latter, he comes from Chicago in all haste; he brings his lawyer, Mr. Tighe, to his bedside; Tighe takes instructions, and draws the paper here propounded, together with an agreement, both of which were executed. In his testimony, Tighe says that the decedent gave him as a reason for the insertion of the clause which is found in this instrument, by which the payment of the sons' legacies is deferred, that his business with Smith was not to be closed up by the latter, under the agreement simultaneously made, until a certain future time.

Smith seems to have boasted somewhat of his participation in the making of this will, and it is altogether probable that the postponement of the time for settlement of the business was a matter of importance to him, though he does not appear to have been personally active, or to have attended himself at the execution of the will, at which he was silently present. It is likely that his agency in making the will has been exaggerated, by himself, in the language used by him after his partner's death, or by those who have undertaken to repeat that language on this trial. I do not think he is shown to have influenced

in any way the dispositions of the will as to the naming of the legatees or the legacies.

After this paper was executed, Tighe destroyed the Williams' will, by lighting a match and burning it, in the sight and presence of the decedent.

The only evidence produced to show mental incapacity in the decedent, is that of John Crozier, whose testimony is somewhat uncertain in itself. Crozier says that during his last sickness, the decedent " was not conscious once " —(he means on one occasion,) " when he was there. *That* he knows." " At one time, he (decedent) was not conscious." " Twice the witness visited decedent, and thinks he was not conscious. · Once he visited him and he was conscious." " The last time the witness was there, he thought the decedent was under the influence of liquor. It was about three days before he died." " Witness was not there more than fifteen minutes." As the paper propounded was executed twelve days before the death of the decedent, there is nothing here affecting his mental capacity.

Dr. Cyrus Walker, the attending physician, testifies that the disease of the decedent was tubercular consumption, of which he died; that he retained his mental powers up to the day of his death, and that his mind was unimpaired. This witness never saw him under the influence of liquor.

The soundness of his mind appears thus to be placed beyond doubt.

In the matter of influence acting upon the mind of the decedent in making this instrument, I find absolutely no traces of personal solicitation or inducement on the part of the proponent. Undoubtedly he was influenced by the fact of the relation he bore, or supposed he bore, towards her. And it is upon this point that the opposition to the paper propounded, hinges.

To possess capacity for the execution of a testamentary paper, it has been held that the person executing it should have an intelligent consciousness as to his own property,

as to those who have claims upon him, and as to those who are to be made the beneficiaries of his act. It is argued for the contestants in this case, that if the decedent supposed his wife Harriet Jane, as he himself declared, to be dead, he was then under a misapprehension as to his legal and social relations, which must invalidate his will. The language of the paper propounded (into which, in such a case, it is competent for the Surrogate to look, for evidence of the mental condition of its maker), is cited to show that it was made under a delusion. And the inference is sought to be drawn that, had there been no such delusion concerning his wife's death, the decedent would have made proper provision for her, as he has done for her whom he supposed to stand in her place.

It is, then, assumed that the decedent actually believed his wife dead, in consequence of some information that had come to him, and of which we are not aware. Inasmuch as presumptions should be in favor of innocence from crime, it is urged that it is charitable to suppose he believed her dead when he went through the ceremonial of marriage with the proponent; for if he knew she was living, he was intentionally a bigamist. It is claimed that he believed her dead.

I think it made no difference to him whether she were living or dead. He was a man who had fled from Tennessee under inculpation of a serious offense; had escaped from those who pursued him; had renounced the sight of his wife and children forever; had caused his wife, in all probability, to receive the false news of his death, and had changed his name in part, and hidden himself in the crowds of a great city. Here in New York he had cohabited with Eliza Moore; had separated from her, and had addressed his attentions to the proponent, representing himself as a widower, and married her. I do not know what stronger circumstances could be combined together, to show a case of total estrangement of affection from his wife. He had probably known no more of her

fate, of how she had lived and fared from the moment he dispatched his false and cruel message, than she had known of him and his. Hundreds and hundreds of miles intervened between his lodgings in Third avenue in New York, and her humble home at White's Creek in Tennessee. Is it not a violent inference, in the face of these facts, to claim that had the decedent supposed or even known that his wife was alive, he would have willed her any portion of his later earnings? She was forsaken, abandoned and utterly forgotten. Dead or alive, she was nothing to him; she had no place in his affections or in his remembrance. Dead or alive, he did not recognize that she had any claims upon him.

If then he believed her to be alive, he would have probably acted as he did act.

And let us suppose, what is altogether likely, that McGuire never really believed that Harriet Jane, his wife, was dead. He does not appear ever to have told anybody how, or where, or when she had died, or to have given any particulars. It may be that he thought her hidden from his life, forever, in the mountains of Tennessee, and never likely to hear of him or his doings in this distant city. He may have invented the story of her death out of the whole cloth, to deceive the proponent, when he proposed, to her, marriage. Certain it is that if he believed his wife alive, he did not intend to recognize her claims upon him in any way. He never ventured back to Tennessee, although the memory of his offenses must have long since died out there, and he would have been able to revisit the place and inquire for his sons with impunity to himself. It is quite evident that he uttered a falsehood, when he said to Weed that he had written to his sons; and it may have been equally a falsehood when he said that he had heard his wife was dead.

In this view of the probabilities, we must conclude that the decedent may have used the term he applies to the

proponent, of "my beloved wife," with an understanding of its falsity. It then becomes an absolutely unimportant misdescription of the proponent.

The law will allow a man to leave all his personal property to his mistress, and to cut off his lawful wife, if he do so with free, sound and disposing mind, and with due legal formalities. In such a case, however, the law looks suspiciously for coercion, or undue influence, such as compels the maker of the will to do something which is against his free volition. There must not be a fear, a desire of peace, or any other inducing feeling which overpowers him, and which he cannot resist. (*Blakely* v. *Blakely*, 33 *Alabama R.*, 611.) A due and lawful influence may be exerted, surely, by a person who believes herself to be the wife, where there is no constraint, nothing but mere persuasion and solicitation. (*Sutton* v. *Sutton*, 5 *Harrington Delaware R.*, 459; see *Tunison's matter*, 4 *Bradford R.*, p. 138.) In the case before me I see no traces whatever of any active influence, good or bad, exerted or attempted to be exerted, by the proponent, and I must hold that whatever passive influence may have moved him, in consequence of his relations with her, there is no probability that the interests of his wife, Harriet Jane, could have been affected in the least by it. He had abandoned and forgotten her, years before he had contracted the matrimonial alliance with the proponent.

He names the proponent as his "beloved wife." She was not his wife in contemplation of law. The conclusion does not follow that he would have left his real wife the same or any bequests, had he known the latter was living. The facts of the case involve precisely the contrary conclusion. He followed the evident bent of his affections. He would not have done otherwise than he did, in my judgment, had he known the facts. It is at least for the contestants to show that he would have done so.

In *McMahon* v. *Ryan*, 20 *Penn.*, p. 329, the will used the words "my husband," in naming a legatee. It

was claimed that the testatrix was not the wife of the person she had so designated; that she had a former husband alive when she married that legatee, and that the latter knew it. The evidence was ruled out.

My conclusions, as to the facts of this case, are : first, that the testator was competent in mind; secondly, that he was under no error or delusion of facts which affected or was likely to affect his action; and thirdly, that there was no undue influence. There must be a decree of probate.